UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTINE FISKE, ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MEYOU HEALTH, INC.; ) <br> INSPERITY PEO SERVICES, L.P. ) <br> Formerly Administaff Companies II, L.P.; ) <br> HEALTHWAYS, INC.; and ) <br> CHRIS CARTTER, ) <br> Defendants. ) <br> ) | CIVIL ACTION NO. 13-CV-10478 |

**PLAINTIFF'S MEMORANDUM IN OPPOSTION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION PURSUANT TO F.R.C.P. 56(d)**

**INTRODUCTION**

The plaintiff opposes the Defendants' motion for Summary Judgment on the grounds that there are genuine issues of material fact in dispute, and that the Defendants are not entitled to summary judgment as a matter of law. The Plaintiff disputes, in pertinent part, the Defendants' Undisputed Statement of Facts submitted by the Defendants. Therefore, in accordance with Federal Local Rule 56.1, the Plaintiff submits a Further Statement of Material Facts of record as to which it is contended there exists a genuine issue to be tried, incorporated by reference herein. The Plaintiff also moves, in the alternative, that this Court defer hearing the Defendants' motion until the close of discovery, pursuant to F.R.C.P. 56(d).

**SUMMARY JUDGMENT STANDARD**

At the summary judgment stage, a court must "draw all reasonable inferences in favor" of the nonmoving party. Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000). In reviewing the record, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. at 151. A court "may not consider the credibility of witnesses, resolve conflicts in testimony or evaluate the weight of the

1

evidence." McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006). "Determinations of motive and intent, particularly in discrimination cases, are questions better suited for the jury." Id. at 19. Moreover, "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

## ARGUMENT

A claim of discrimination on the basis of pregnancy must be analyzed in the same manner as any other sex discrimination claim brought pursuant to Title VII. EEOC v. Ackerman, Hood & McQueen, Inc., 956 F.2d 944, 947 (10th Cir.), cert. denied, 506 U.S. 817 (1992); Maddox v. Grandview Care Center, Inc., 780 F.2d 987, 989 (11th Cir. 1986). Plaintiff is pursuing relief under both the "mixed motive" and the "McDonnell Douglas" methods for establishing unlawful sex discrimination. She is permitted to proceed simultaneously on both fronts. Fernandes v. Costa Bros Masonry, Inc., 199 F.3d 572, 581 (1st Cir. 1999); overruled on other grounds, Desert Palace, inc., v. Costa, 539 U.S. 90, 94 (2003); see also Price Waterhouse v. Hopkins, 490 U.S. 228, 247 n.12 (1989).

### I. Plaintiff Has Produced Sufficient Evidence to Defeat Summary Judgment on Her "Mixed Motive" Claims Under G.L. c. 151B and Title VII

#### A. Standard of Proof in Mixed Motive Cases

Mixed motive is applicable to claims brought under both G.L. c. 151B and Title VII. See Atkinson v. National Boston Video Center, Inc., 60 Mass.App.Ct. 1106, 1106 (2003)(G.L. 151B); Desert Palace, Inc., 539 U.S. at 94 (2003)(Title VII). The mixed motive analysis is the same under Massachusetts and federal law. See Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrim., 431 Mass. 655, 666-67 (2000); Fernandes, 199 F.3d at 580. A plaintiff may obtain a "mixed motive" jury instruction if she can "present sufficient

2

evidence for a reasonable jury to conclude, by a preponderance of the evidence, that... sex ... was a motivating factor for any employment practice." <u>Desert Palace, Inc.</u>, 539 U.S. at 101.

Sex is "a motivating factor" in an employment decision when Defendants "use[] a forbidden consideration [sex] with respect" to that decision. <u>Id.</u> at 98. Once a plaintiff meets her burden of establishing that sex was "a motivating factor" in the employment decision, her work is done; she has established liability for sex discrimination, **even if "other factors also motivated the practice,"** 42 U.S.C. § 2000e-2(m)(emphasis added), and **even if the defendant "would have taken the same action in the absence of the impermissible motivating factor"**. 42 U.S.C. § 2000e-5(g)(2)(B)(emphasis added). The plaintiff "is not obliged to separate out the relative import of each element that went into the decision." <u>See</u> <u>Fernandes</u>, 199 F.3d at 580. It is sufficient that she establish that "the proscribed factor played some part in the decisional calculus." <u>Id.</u>

    **B. There is Sufficient Evidence From Which A Jury Could Conclude That Defendants Unlawfully Considered Plaintiff's Sex In Terminating Her Employment**

In September 2011, the Plaintiff, Christine Fiske ("Fiske") informed her supervisor, Chris Cartter ("Cartter"), that she was pregnant and that she was planning to take time off for maternity leave in April of 2012. Plaintiff's Further Statement of Material Facts ("PSMF") ¶ 32. In response, Cartter

> seemed somewhat concerned. He told me that when his partner had their third child she opted to not go back to work. He told me he would have to plan for different circumstances because when someone has a child you never know how it will impact their decision to come back to work.

PSMF ¶ 33. Similar statements have been held to constitute evidence of discrimination that a reasonable jury might credit that gender played a role in the decision to eliminate

3

plaintiff's position.  See Eslinger v. U.S. Cent. Credit Union, 866 F.Supp. 491, 497-498 (D. Kansas 1994) (statement by individual responsible for the decision to terminate the plaintiff that "he had doubts regarding the likelihood that women who give birth to a second child return to work"). After this meeting, the treatment Fiske received from Cartter changed, their meetings became less frequent and he gave more pushback than she had received previously. PSMF ¶ 34.  In addition, Fiske was occasionally left out of regular steering committee meetings after she announced her pregnancy. PSMF 34.  This furthers the inference that Cartter bore some animus against her pregnancy/planned maternity leave.[1]

Throughout Fiske's tenure, both before and after her pregnancy announcement, she directly observed (or was informed by others of) facts/events which are suggestive of discriminatory animus against female employees on the part of Cartter and MeYou Health ("MYH").[2]  From this evidence the jury can infer that Cartter and MYH had a negative attitude towards female employees generally, that they specifically took issue with Fiske's pregnancy and her plans to take twelve (12) weeks of maternity leave, and that these negative feelings played a role in the decision to terminate Fiske.

On approximately January 5, 2012, Fiske informed Cartter via email that she would need to go on maternity leave in April, and that she had prepared a contingency plan regarding hiring an intern to manage her tasks in the interim. PSMF ¶ 42. Seven days later,

---

[1] It is also worth noting that no other employee of MYH has taken maternity leave. PSMF ¶ 35. Two men have taken accrued paid time off to care for their newborns, but both were men and both returned in approximately two weeks as opposed to Plaintiff's planned absence of 12 weeks. PSMF ¶ 35.

[2] Facts suggestive of anti-female animus by Cartter and MYH include the following: (1) a 4 to 1 ratio of males to females at MYH. PSMF ¶ 36; (2) two of the three employees terminated at MYH since 2010 were female and neither was terminated for performance reasons. PSMF ¶ 37; (3) comments by Cartter to Plaintiff that another female employee, Erin McGarry, was difficult to work with. PSMF ¶ 38; (4) Comments by Mr. Cartter to Plaintiff that he was unhappy with a another female employee when there was no business reason for him to make such comments since Plaintiff did not work with or supervise this employee. PSMF ¶ 39; (5) upon her voluntary departure from MYH, female employee Alicia Benjamin was initially improperly denied unused vacation pay. PSMF ¶ 40; (6) a female contractor to MYH has reported to the Plaintiff that she had some difficulty with receiving timely payments for services rendered. PSMF ¶ 41.

on January 12, 2012, Cartter transmitted an email to Erin McGarry ("McGarry") and Trapper Markelz ("Markelz") stating that he was terminating Fiske. PSMF ¶ 43. The next day, on January 13, 2012, Cartter met with Healthways CEO Ben Leedle ("Leedle") and advised him of Cartter's decision to terminate Fiske. PSMF ¶ 44. Fiske was subsequently terminated on January 27, 2013. Defendants' Statement of Undisputed Facts, ¶ 7.

The close temporal proximity in time between Fiske's email that she would be leaving shortly for maternity leave and Cartter's decision to terminate her, coupled with the other elements of circumstantial evidence discussed above, raises a clear inference of discrimination.[3] See Briggs v. Women In Need, Inc., 819 F.Supp.2d 119, 128-129; see also Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 423 (1st Cir.)("chronal proximity" of the defendant's questions regarding the plaintiff's plans to have more children and her dismissal is evidence of discrimination).

Further evidence of discriminatory motive can be found in the defendants' shifting and flimsy rationales for Fiske's termination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (holding that proof that the defendant's explanation is unworthy of credence is a valid form of probative, possibly persuasive, circumstantial evidence of intentional discrimination). In this litigation, the Defendants maintain that Fiske was terminated in order to free up marketing budget funds to expend on what the defendants describe as an important, clinical trial planned for 2012. D. Memo. at 8-9. This explanation lacks credence and is contradicted by other reasons advanced by the Defendants and their employees.

First, and most importantly, Defendant Cartter, has explicitly and repeatedly stated that the money saved on Fiske's salary was **not** a factor in the decision to terminate her.

---

[3] Cartter's decision was made, at most, 7 days (5 business days) after being notified of Fiske's planned maternity leave, but was likely even sooner.

PSMF ¶ 51.  This unequivocally contradicts the rationale advanced by defendants in this litigation and in their Summary Judgment motion.

Furthermore, Fiske was paid through a separate line item than the marketing budget. PSMF ¶ 45. The "elimination" of the ongoing marketing budget in 2012 did not affect Fiske's budgeted salary.[4]  Moreover, the "elimination" of the marketing budget in 2012 did not eliminate the need or ability to perform many marketing tasks.  The budget was simply focused towards the funding of marketing tasks to support the clinical trial. PSMF ¶ 48. Ongoing marketing work still needed to be (and could be) performed without a budget.[5] PSMF ¶ 50.  In fact, marketing work continued to be performed by Seth Lawton, Alicia Benjamin, and Eugenie Olson after Plaintiff's termination.  PSMF ¶ 49.

Additionally, Fiske was paid approximately $130,000 per year in salary, PSMF ¶ 52, yet Cartter's email announcement of her termination specifically states that MYH needed and intended to hire a salesperson right away. PSMF ¶ 43. The planned salary for this salesperson was $230,000.00. PSMF ¶ 53. This discredits the proffered reason (budget shortfall) for Fiske's termination since it indicates that the defendant was able to afford an employee making $230,000 despite its claims of a budgetary need to reallocate Fiske's $130,000 salary.[6]

Moreover, the Defendants state that there was no money to pay for marketing and thus no reason to retain Fiske.  However, the Marketing Department was not eliminated

---

[4] It be noted that, contrary to the Defendants' insinuations, the marketing budget was never "eliminated." Rather, in 2012, the marketing budget was shifted to pay for recruiting users to the clinical trial.  PSMF ¶ 46. These efforts were primarily through Facebook advertising, which was clearly a marketing function that was being performed by the plaintiff and her subordinate, Seth Lawton. PSMF ¶ 47.

[5] Defendant's "Head of Product" Trapper Markelz, has acknowledged that small startups like the defendant often perform marketing tasks without a budget.   PSMF ¶ 77.

[6] Again, however, the claim that Fiske's salary was needed to fund the clinical trial is also contradicted by the direct testimony of Chris Cartter that saving her salary was **not** a factor in her termination.  PSMF ¶ 51.

upon Fiske's termination as two employees remained working in the Marketing Department and one employee even received a raise of $10,000.00. PSMF ¶ 54, 79. Furthermore, the remaining marketing employees were never terminated and each ultimately resigned on their own terms later in 2012. PSMF ¶ 55.

Finally, the defendants and their employees have proffered several different reasons for the termination, suggesting that the proffered reason is a pretext. Specifically, in their position statement before the Massachusetts Commission Against Discrimination, the defendants falsely asserted that Fiske was terminated because of drastic cuts to the marketing budget imposed upon MYH by co-employer Healthways, which rendered the need for Plaintiff's marketing services unnecessary.[7] PSMF ¶ 56. In addition, several MYH employees have indicated that they were either told, or came to the understanding, that Fiske had been terminated as a result of a business plan to eliminate the entire marketing department. PSMF ¶ 57. The Defendants did not advance this argument during this litigation until December, 2013 and have produced no documentation to confirm or deny such a plan.[8] These shifting rationales are themselves evidence of discriminatory motive. See Reeves, 530 U.S. at 147.

In sum, Fiske has more than enough evidence to establish that her planned maternity leave played a role in the decision to terminate her and that therefore said decision was a violation of G.L. c. 151B and Title VII.

### II. Plaintiff has Produced Sufficient Evidence to Defeat Summary Judgment on Her "Pretext" Claim Under G.L. c. 151B and Title VII

---

[7] This justification has since been abandoned by the defendants after it was pointed out that the "cuts" to the marketing budget did not reduce the budget below the amount that had been previously budgeted and planned for at the time plaintiff was hired. PSMF ¶¶ 61, 62.

[8] Cartter specifically stated in December that the budget issues would not result in any layoffs. PSMF ¶ 58. This contradicts the claim that there was a plan to eliminate the marketing department.

As an alternative to her mixed motive claim, Fiske is also able to establish pregnancy discrimination under the *McDonnell Douglas* burden shifting framework, which governs claims brought under either Chapter 151B or Title VII.  See Windross v. Barton Protective Serv., Inc., 586 F.3d 98, 103 (1st Cir.2009); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Abramian v. President & Fellows of Harvard Coll., 432 Mass 107, 116 (2000).  However, because the legal standards for burden shifting differ slightly between G.L. c. 151B and Title VII they must be addressed separately.

### A.  Pretext Claims under M.G.L. c. 151B

#### 1.  Standard of Proof under G.L. c. 151B § 4(1)

The Supreme Judicial Court of Massachusetts has adopted the three-part *McDonnell-Douglass* test to employment discrimination claims arising under Chapter 151B. See Abramian, 432 Mass. at 116.  Under *McDonnell Douglas*, a plaintiff may proceed to her ultimate burden after a "burden shifting" process. A plaintiff must first establish a prima facie case of discrimination. Santiago Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000). Once that is established, the burden is shifted to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. Id. If Defendants meet this burden, the plaintiff then proceeds to her ultimate burden of proving discrimination. Id.

#### 2.  Fiske's Prima Facie Case Under G.L. c. 151B

The burden of establishing a prima facie case of disparate treatment is not onerous. Under G.L. c. 151B, a plaintiff must show that (1) she is pregnant, (2) her job performance has been satisfactory, but (3) the employer nonetheless dismissed her from her position (or took some other adverse employment action against her) and (4) the circumstances of the removal raise a reasonable inference of discrimination." See Sullivan v. Liberty Mutual Ins.

Co., 444 Mass. 34, 41-45 (2005).[9]

It is undisputed that Fiske has established the first three prongs of her prima facie case.[10] Moreover, as set forth Part I, *supra*, the circumstances of her termination, coupled with the chronological proximity to her notice that's he would be taking leave, raise a reasonable inference of discrimination, satisfying Massachusetts' fourth prong. She therefore has presented a prima facie case.

### 3. Plaintiff has identified sufficient evidence that the reasons offered by the Defendants for her discharge were pretext.

Once the plaintiff has presented a prima facie case, the burden shifts to the defendant to proffer a legitimate non-discriminatory reason for the termination. Wheelock College v. Mass. Comm'n Against Discrim., 371 Mass. 130, 134-136 (1976). An employer must not only give a lawful reason for its employment decision but also must produce credible evidence to show that the reason advanced was the real reason. Id. at 138. The Defendants have advanced a reduction in force defense and have produced some (not necessarily credible) evidence that the reduction in force was a factor in Fiske's termination. Here, the Defendants claim that Fiske's position was eliminated for budgetary reasons in order to fund its clinical trials. D. Memo. at 8-9.

Having offered this reason, the burden shifts back to the plaintiff to establish that the proffered reason is a pretext. Massachusetts law is less stringent than federal law in analyzing pretext in the "position elimination" context, Specifically, it allows a plaintiff to overcome a motion for summary judgment "if the plaintiff shows that just one of the proffered reasons was pretextual." Douglas v. J.C. Penney Co. Inc., 474 F.3d 10, 14 n. 2

---

[9] Unlike Title VII, G.L. c. 151B does not require proof that the plaintiff's job duties were replaced.

[10] (1) She was pregnant, PSMF ¶ 32, (2) her job performance had been satisfactory, PSMF ¶¶ 59, 60, and (3)

(1st Cir. 2007) (citing <u>Joyal v. Hasbro, Inc.</u>, 380 F.3d 14, 17 (1st Cir. 2004); <u>Lipchitz v. Raytheon Co.</u>, 434 Mass. 493, 498-99 (2001)). Here, it is clear that Defendants'' "freeing up capital" excuse is pretext simply based upon the fact that a new position was advertised immediately thereafter that paid $230,000 and because the intent to hire a salesperson for $230,000 was advanced by Defendant Cartter in the very email in which he notified others of the termination of the plaintiff. PSMF ¶ 43, 53.

Pretext is also established by the several different and somewhat contradictory explanations for the termination which have been offered by the Defendants over time. During the MCAD proceedings, the reason given for Fiske's termination was the reduction of MYH's marketing budget by Healthways. PSMF ¶ 56. This explanation has been abandoned in light of its clear falsity.[11] Furthermore, several MYH employees have indicated that they were directly told (or came to the conclusion) that a strategic business decision to eliminate the marketing department was the reason for Fiske's termination. This contradicts the other two proffered reasons and itself appears to be false.[12]

Given the increasing number of conflicting explanations that the Defendants have given, the Plaintiff has satisfied the standard of showing that at least one (and in fact all) of the proffered reasons for her termination is pretext. The plaintiff has thus easily satisfied

---

that she was dismissed from her position, Defendants' Undisputed Statement of Facts ¶ 7

[11] The marketing budget was approximately $330,000 when Fiske was hired. PSMF ¶ 61. It was later increased by approximately $1,000,000 over two years. PSMF ¶ 62. It was then subsequently reduced back down to approximately $330,000. PSMF ¶ 63. It was not cut at all from the funding level that obtained when Fiske was hired. In addition, this reason itself appears pretextual since it is contradicted by Cartter's contemporaneous email which states that the need to hire of a salesperson was the reason for the termination. PSMF ¶ 43. This reason is also contradicted by the current reason offered. Defendants' Memo. at 8-9.

[12] Defendants have produced no evidence reflecting a business plan to eliminate the marketing department. Fiske's subordinates Seth Lawton and Alicia Benjamin were both retained after her termination and Lawton was given a raise of $10,000. PSMF ¶ 54, 79. Neither was laid off and both stayed on for several months in the Marketing Department. PSMF ¶¶ 49, 55. Neither appears to have been assigned to a different department nor were their job titles changed. PSMF ¶ 84. When they each left voluntarily, the defendants at that point declined to replace Lawton and replaced Benjamin and reassigned her position to a new department. PSMF ¶ 84. This sequence of events is suggestive of a post-termination decision not to re-staff the marketing

the standard required to defeat a motion for summary judgment. See Lipchitz, 434 Mass. at 498-99.

### B. Pretext Claims Under Title VII

#### 1. Fiske's Prima Facie Case Under Title VII

As in G.L. c. 151B, the burden of proof on a pretext claim under Title VII involves the same three stage burden shifting process. Santiago Ramos, 217 F.3d at 54. All prima facie elements are the same under Title VII and G.L. c. 151B, except for prong four. In Title VII cases, prong four of the prima facie case requires that plaintiff establish that after her termination, her duties were performed by a comparably qualified person. See Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 421 (1st Cir.1996). As articulated in Part II(A)(2), *supra*, the first three elements of the prima facie case are easily proven. See fn. 10, *supra*.

Here, Fiske's job functions were absorbed by several different employees of the defendants who are not members of the protected class (pregnant/maternity leave), and this fact, coupled with the circumstances evidencing discriminatory animus,[13] is sufficient to establish the fourth element. See Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 760 (1st Cir. 1994); see also Rodriguez-Torres v. Carribean Forms Manufacturer, Inc., 399 F.3d 52, 59-60 (1st Cir. 2005). After she left, Fiske's direct marketing work was performed by Seth Lawton, Alicia Benjamin, and Eugenie Olson. PSMF ¶ 49.

Specifically, Lawton handled the totality of the Facebook advertising, including portions of that project that plaintiff was responsible for and that plaintiff had specifically performed in the past. PSMF ¶ 64. Fiske had directed, edited, proofed and approved Alicia Benjamin's social media work prior to her termination and after her termination that work

---

department which is only now being offered as justification for Plaintiff's termination.

[13] See Part I, *supra*.

was either handled exclusively by Benjamin or was approved by some other supervisor. PSMF ¶ 65. Eugenie Olson attended a conference in Nashville in which she specifically advertised and pitched MYH products to potential customers. PSMF ¶ 66. Ms. Olson also engaged in some additional discrete marketing tasks that would have otherwise been performed by the plaintiff. PSMF ¶ 67.

In addition, Lawton was given a $10,000 pay raise shortly after Fiske's termination, PSMF ¶ 54, indicating that in the immediate aftermath of Fiske's termination, he was given increased responsibilities and possibly was put in charge of marketing.[14] Furthermore, Fiske was the direct supervisor of Benjamin and Lawton and was the head of the marketing department. PSMF ¶ 68. It is a reasonable inference that these individuals, who stayed on after Fiske's termination, continued to be managed by someone. Whoever it was that supervised and managed these two employees was essentially taking on Fiske's job duties.

Furthermore, even if Fiske's job duties were not absorbed by other employees at MYH, they were clearly absorbed by employees at Healthways. The defendants themselves have stated that since Fiske's termination, at least some marketing work for MYH has been performed by its parent corporation (and co-employer), Defendant Heathway's. PSMF ¶ 69. The Defendants also admit that employees of MYH, including Fiske, are co-employees of Healthways. PSMF ¶ 71. As Fiske has clearly established that her duties were redistributed to other employees of the defendants under circumstances which give rise to an inference of discrimination, she has established a prima facie case under Title VII.

          **3. Fiske has presented sufficient evidence from which a reasonably jury could conclude that the Defendants'**

---

[14] Seth Lawton's official title was Marketing Manager. He was the second ranking member of the marketing department prior to Fiske's termination. PSMF ¶ 72; EX. 16, Organizational Charts.

**proffered reasons for terminating her were pretext.**

As the Plaintiff has established a prima facie case, the burden shifts to the Defendant under *McDonnell Douglas* to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination. The Plaintiff is then required to show in addition to pretext that the true reason was prohibited discrimination." Douglas, 474 F.3d at 14.

Fiske may establish pretext in "a number of ways" including (1) "discriminatory comments by the key decisionmaker or those in a position to influence the decisionmaker;" (2) "after the fact justifications" for the decision; and (3) "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employers proffered legitimate reasons." Santiago-Ramos, 217 F.3d at 55-56. As set forth above, the Plaintiff has shown discriminatory comments by the key decision maker, Cartter, regarding the ability/willingness of a woman to remain on after giving birth to a third child.[15]

The plaintiff has also shown hostility and discriminatory animus on the part of Cartter and MYH towards female employees generally.[16] The plaintiff has also shown that the current proffered reason is an "after the fact justification" which contains weaknesses,[17] inconsistencies,[18] incoherencies and contradictions[19] and which is only one of a number of

---

[15] The plaintiff has also showed discriminatory conduct by Cartter, who, after learning of her pregnancy, began treating her more harshly. PSMF ¶ 34.

[16] See Section I, *supra*.

[17] The proffered reason is rendered particularly suspect by the timing of Fiske's termination, i.e. shortly after reminding Cartter that she was going out on maternity leave.

[18] The "budgeting" excuse is also rendered suspicious by the fact that two of Plaintiff's subordinates remained working in the Marketing Department - both of whom plainly had to be supervised by (and report to) someone in the corporate structure after Plaintiff's departure and one of whom received a $10,000 raise shortly after Plaintiff's departure.

[19] Chris Cartter has denied that plaintiff's salary savings played any role in her termination. PSMF ¶ 51.

shifting, contradictory rationales proffered by the defendants in the wake of this lawsuit.[20] Each of these showings provides more than ample evidence to show the pretextual nature of the Defendants' employment decision and to defeat the Defendant's motion for summary judgment as to the Title VII claim.

### III. The Defendant's Summary Judgment Motion Must Be Denied as to Plaintiff's Family and Medical Leave Act (FMLA), Massachusetts Maternity Leave Act (MMLA) and Retaliation Claims

The Defendants contend that the FMLA is inapplicable to the Plaintiff because MYH never had more than 50 employees. D. Memo. at 12. First, this assertion is not backed by affidavit and must be disregarded. Secondly, Defendants Insperity and Healthways are Fiske's "co-employers," PSMF ¶ 73, and discovery must determine whether these companies possess sufficient personnel to allow Fiske to be covered by the FMLA.[21] In contrast, the MMLA covers employers with at least six employees, and it is clear MYH, along with Fiske's other "co-employers" easily satisfy this requirement, as Fiske recalls between 12 and 18 employees working at MYH during her tenure. PSMF ¶ 70.

The Defendants contend that since the Plaintiff was terminated before she went on maternity leave, her claim of retaliation, her FMLA and MMLA claims must fail. Fiske first informed Cartter in September, 2011, that she intended to take maternity leave. PSMF ¶ 32, and again in early January 2012 of her intention to go on maternity leave between April and June of 2012. PSMF ¶ 42. Fiske therefore provided the Defendants with over

---

[20] These shifting reasons have been discussed above and can be summarized as follows: (1) to free up funds to hire a salesperson; (2) due to the reduction of the marketing budget by Healthways; (3) business decision to eliminate the marketing department; (4) to free up funds to fund the clinical trial budget; (5) the shift the marketing responsibilities to Healthways.

[21] No one from Healthways or Insperity has been deposed as of this filing. However, co-defendant Chris Cartter has indicated that Healthways alone has thousands of employees and would thus qualify under the

two months' notice of her expected departure date and intention to return. Cartter notified Markelz and McGarry of his decision to terminate Fiske on January 12, 2012, PSMF ¶ 43, and terminated her on January 27, 2011. Given the close proximity in time between the Plaintiff's notice of her pregnancy leave and her termination, the evidence of Cartter's discriminatory statements and attitudes, and the shifting, contradictory, evolving rationales for the termination, as set forth more fully in parts I and II, *supra*, the Plaintiff has presented sufficient evidence of retaliation and violations of the MMLA and the FMLA.

### IV. Summary Judgment Is Premature under F.R.C.P. 56(d) as Discovery Remains to be Completed

For the reasons stated above, the plaintiff is confident that as of this filing there is more than sufficient evidence to defeat summary judgment on each of her claims. However, should this court disagree, the plaintiff hereby requests, pursuant to Fed. R. Civ. P 56(d), that consideration of this summary judgment motion be delayed until the close of discovery. See Fed. R. Civ. P. 56(d)(if a nonmovant shows by affidavit or declaration that, for specified reasons, she cannot present facts essential to justify her opposition, the court may; (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any appropriate order). District Courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter. See United States v. One Lot of U.S. Currency ($68,000), 927 F.2d 30, 33-34 (1st Cir.1991).

The criteria for satisfying Fed. R. Civ. P. 56 (d) for reasons relating to incomplete discovery include authoritativeness, timeliness, good cause, utility, and materiality. See Resolution Trust Corp. v. North Bridge Associates, 22 F.3d 1198, 1202-03 (1st Cir. 1994).

---

FMLA. PSMF ¶ 80.

These requirements are not inflexible and district courts are vested with considerable discretion in their administration. See Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1st Cir.1988). One or more of the requirements may be relaxed, or even excused, to address the exigencies of a given case, when all five requirements are satisfied, however, a strong presumption arises in favor of its relief. Resolution Trust Corp., 22 F.3d at 1203.

### A. Authoritativeness and Timeliness

The Plaintiff has accompanied her motion with an affidavit and an affidavit of counsel. As a party, Fiske's affidavit is sufficiently authoritative to satisfy the requirements of Rule 56(d). Id. at 1204. The Plaintiff has raised this 56(d) motion within the timeframe permitted in the Rules.

### B. Good Cause

In an employment discrimination case, discovery is almost always complete at the time of filing a Summary Judgment motion. See Sullivan, 444 Mass. 34, 45. Waiting until the close of discovery prior to entertaining motions for summary judgment is particularly appropriate in this context due to the fact that direct proof of discrimination is often elusive. Id. at 46.

Discovery is not complete in this case. PSMF ¶ 74. The Defendants' holiday summary judgment filing was served on December 13, 2013, over one month prior to the close of discovery (January 29, 2014.). At this time, there are several witnesses who have yet to be deposed, including the F.R.C.P. 30(b)(6) depositions of each of the defendants. PSMF ¶ 75. Furthermore, depositions of several employees of MYH and Healthways have yet to be taken, and there are additional documents which have yet to be produced by the defendants in response to Plaintiff's Request for Production. PSMF ¶¶ 74, 75.

### C.  Utility and Materiality

A party can satisfy the utility benchmark in a 56(d) proffer by presenting a plausible basis for a belief that discoverable materials exist that would likely suffice to raise a genuine issue of material fact and, thus, defeat summary judgment. See Resolution Trust Corp., 22 F.3d at 1206-07. The facts the movant seeks to discover must be foreseeably capable of breathing life into his claim or defense. Id. at 1207. The threshold of materiality at this stage of a case is necessarily low. Id.  The evidence offered need not be presented in a form suitable for admission as evidence at trial, so long as it rises sufficiently above mere speculation. See id. at 1206.

The depositions of several employees and former employees of MYH and Heathway's have yet to be taken, and Defendant Cartter's deposition is not complete. PSMF ¶ 75. These upcoming depositions include the two former employees who worked underneath the plaintiff at the time of her termination, Seth Lawton and Alicia Benjamin. PSMF ¶ 75. These individuals have important information concerning the distribution of the plaintiff's duties after her termination. PSMF ¶ 81. In addition, these employees are likely to have direct knowledge of the circumstances surrounding the plaintiff's termination, the reasons given by the defendants for the termination, as well as facts which may call into question the veracity of the defendants' claimed reason for the termination. PSMF ¶ 81. They may also have information concerning the defendants' discriminatory animus. PSMF ¶ 81.

Additional expected witnesses also include the CEO and CFO of Healthways, both of whom were directly involved in the budgetary issues that are the claimed basis for the plaintiff's termination.  PSMF ¶ 82. These individuals were also allegedly involved in the

decision to terminate the plaintiff and can both be expected to testify as to facts which may contradict the claims of plaintiff's immediate superiors. PSMF ¶ 82.

Finally, the plaintiff anticipates calling an employee of the defendant, Josee Poirier who designed and ran the clinical trials that form the basis for the alleged termination of the plaintiff. PSMF ¶ 83. This witness can be expected to provide insight as to the veracity of the defendants claimed reason for terminating Fiske as well as details about the clinical trials and the budgeting for it. Id. She can also be expected to testify as to details of Fiske's employment and the facts and circumstances surrounding her termination, all of which are relevant to the issues raised in this motion for summary judgment. Id.

In addition to deposition testimony, the Plaintiff anticipates obtaining in discovery additional financial information as well as information demonstrating that an employment posting for a sales job was posted by the Defendants after the termination of Fiske. PSMF ¶ 74. The Defendants are supplementing their original production of documents with this information. PSMF ¶ 74. As set forth above, this information is probative on the issue of pretext, where the Defendants have stated that their financial need to fund the study required the termination of Fiske in order to acquire $130,000, yet a salesperson position was advertised for $250,000.00. Further, the Plaintiff anticipates discovering the precise number of employees that work for her co-employers (Healthways and Insperity) for the purposes of addressing that requirement under the FMLA.[22] PSMF ¶ 82.

## CONCLUSION

For the reasons stated, Plaintiff has produced sufficient evidence to defeat summary judgment on all her claims, including her mixed motive and pretext claims under both

---

[22] While MYH states, unsupported, that it has less than 50 employees, the Defendant has a co-employment relationship with the other Defendants who, upon information and belief, and the testimony of defendant Chris Cartter, have far in excess of the minimum number of employees required to trigger FMLA liability.

Massachusetts and Federal law, as well as her claims for violation of the FMLA and MMLA. For these reasons, the Defendants' motion for summary judgment should be denied.

In the alternative, the Plaintiff moves that this honorable court delay its decision on summary judgment pursuant to Rule 56(d), as the plaintiff has not been given a full and fair opportunity to discover important material facts which, once discovered, will further solidify the already solid factual basis for her claims.

WHEREFORE the plaintiff, Christine Fiske, hereby requests that this honorable Court **deny** the defendants' summary judgment motion or, in the alternative, that this Court delay a decision on summary judgment until discovery has concluded.

>
> Respectfully Submitted,
> Christine Fiske
> By her attorneys
>
> /s/ Brian A. Joyce_____
> Brian A. Joyce (BBO# 556539)
> John D. Curran (BBO #565828)
> David K Stevenson (BBO# 670913)
> Joyce & Curran, LLC
> 776R Washington St.
> Canton, MA 02021
> 781-821-2250
> bjoyce@joycelawgroup.com
> jcurran@joycelawgroup.com
> dstevenson@joycelawgroup.com

**CERTIFICATE OF SERVICE**

I, hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 3, 2014

/s/ David K Stevenson_____